AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*February 28, 2025*

Nathan Ochsner, Clerk of Court

| United States of America | ) | |
| v. | ) | |
| | ) | Case No. **4:25-mj-109** |
| Rami Abunakira | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 28, 2025___ in the county of ___Harris___ in the
___Southern___ District of ___Texas___, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:

See the attached affidavit in support of criminal complaint.

☐ Continued on the attached sheet.

*Gina Vogel*

*Complainant's signature*

Sergeant Gina Vogel, FBI Task Force Officer

*Printed name and title*

Sworn to by me and signed by telephone.

Date: ___February 28, 2025___

*Richard W Bennett*

*Judge's signature*

City and state: ___Houston, Texas___

Hon. Richard W. Bennett, U.S. Magistrate Judge

*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**4:25-mj-109**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Gina Vogel, your affiant, being duly sworn, do depose and state as follows:

### I.   Identity and Experience of Affiant

1.      I am a Sergeant with the Texas Attorney General's Office Medicaid Fraud Control Unit and have been so employed for 3 years. Since 2023, I have been assigned as a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") Medicare Fraud Task Force. As a Sergeant and TFO, I have utilized investigative techniques that include electronic surveillance, physical surveillance, interviewing witnesses, execution of federal search and arrest warrants; seizure of computers, phones, email accounts, and digital media; and liaising with federal and local authorities.

2.      I have participated in investigations into violations of federal laws and am currently assigned to investigate: Health Care Fraud, 18 U.S.C. § 1347; Wire Fraud, 18 U.S.C. § 1343; Conspiracy to Commit Health Care Fraud and Wire Fraud, 18 U.S.C. § 1349; the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); False Statements Relating to Health Care Matters, 18 U.S.C. § 1035; Conspiracy to Defraud the United States and to Violate the Laws of the United States, 18 U.S.C. § 371; and Conspiracy to Launder Monetary Instruments and Money Laundering, 18 U.S.C. §§ 1956, 1957.  I have participated in joint investigations of health care fraud with the U.S. Department of Justice's Texas Health Care Fraud Strike Force, the U.S. Department of Health and Human Services, Office of Inspector General, and the FBI.

### II.   Purpose of the Affidavit

3.      This affidavit is made in support of a complaint and arrest warrant charging Rami Abunakira ("ABUNAKIRA") with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, from in and around December 2022 through in and around February 2025.  Since at least August 2020, ABUNAKIRA has been involved with at least six labs in the areas of

Houston, Texas, and Dallas, Texas, that have billed Medicare for genetic testing that is often medically unnecessary and induced by illegal kickbacks. For the first four of these labs, ABUNAKIRA assisted Khalid Satary, a fugitive defendant, with operating the labs and concealing Satary's involvement. ABUNAKIRA was also involved in owning and operating the fifth and sixth labs, although he is not listed as an owner for either lab. Based on the investigation, I have probable cause to believe that from at least December 2022 through at least September 2023, ABUNAKIRA knew: (a) that Satary, his uncle and former boss, was involved in operating and profiting from labs in Houston and Dallas that billed and obtained reimbursement from Medicare for genetic testing; (b) that Satary, as a defendant charged with health care fraud for billing Medicare for medically unnecessary genetic testing induced by kickbacks, was not supposed to be involved in labs billing Medicare; and (c) that Satary's involvement in these labs was being concealed. ABUNAKIRA participated in concealing Satary's involvement from others, including Medicare, and assisted Satary in executing a scheme to defraud Medicare by operating labs that billed Medicare claims for genetic testing that Medicare would not have reimbursed had it known about Satary's involvement. I also have probable cause to believe that from at least May 2023 through at least February 2025, ABUNAKIRA operated two additional labs and caused the submission of false enrollment paperwork to Medicare for these labs, which listed nominee owners to conceal ABUNAKIRA's involvement in these labs. While operating these two additional labs, ABUNAKIRA caused these labs to bill Medicare for medically unnecessary genetic testing.

4.     This case is being investigated by the FBI, the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), and the Texas Office of Attorney General, Medicaid Fraud Control Unit ("MFCU").

5.     Law enforcement officers utilized a confidential human source ("CHS") throughout this investigation.  For the purpose of this affidavit, the CHS will be referred to in the masculine, regardless of gender.  The CHS has provided truthful and reliable information on multiple occasions and the veracity of the CHS has routinely been confirmed through the investigation. The CHS is cooperating in hopes of a possible sentencing reduction for either pending or potential charges against him.

6.     The information set forth in this affidavit is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit.

7.     Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.  All figures, dates, and calculations are approximate.

**III.    The Alleged Offenses**

8.     Federal law makes it a crime for two or more persons to conspire to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.  18 U.S.C. § 1349 and 1347.

**IV.    The Medicare Program**

9.     Medicare is a federally funded health insurance program that provides health care benefits to individuals who are 65 years of age or older or disabled.  It is a "health care benefit

program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f). Medicare is administered by the Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services ("CMS").

10.    Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services. Relevant here, Medicare Part B covers laboratory testing, such as genetic testing, when certain criteria are met.

11.    When receiving and adjudicating claims, Medicare acts through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which are statutory agents of CMS for Medicare Part B. MACs are private entities that review claims and make payments to providers for services rendered to beneficiaries. MACs are responsible for processing Medicare claims arising within their assigned geographical area, including determining whether a claim is for a covered service. Novitas Solutions, Inc. ("Novitas") is the MAC that handles Medicare Part B for Texas and other states. To receive Medicare reimbursements, providers, including clinical laboratories, physicians, and others, who provide services to beneficiaries, need to have applied to the assigned MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, must be signed by an authorized representative of the provider. Form 855B contains a certification that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

12.    In executing CMS Form 855B, providers further certify that they "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

13.    CMS Form 855B also requires providers to report any individuals with a 5 percent or greater direct or indirect interest along with any managing employees of the provider.  Title 42 of the Code of Federal Regulations, Section 420.201 defines an ownership interest as "the possession of equity in the capital, the stock, or the profits of the disclosing entity."

14.    A Medicare "provider number" is assigned upon approval of the provider's Medicare application.  A provider may use that number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.

15.    When seeking reimbursement from Medicare for items or services, providers submit the cost of the item or service provided and a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").

16.    When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

17.    Medicare does not pay for claims that were procured through kickbacks.

**V.    Diagnostic Laboratory Testing Services**

18.    The Social Security Act, 42 U.S.C. § 1395y(a)(1)(A), states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member."

5

19.    Further, 42 C.F.R. § 410.32(a) provides, "[A]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  According to this same regulation, "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

20.    Laboratories purport to offer testing that uses DNA sequencing to detect mutations in a person's genes that could indicate an increased risk of developing diseases.  These include genetic testing to detect mutations that could indicate a higher risk of developing certain types of cancers in the future, an increased risk of developing serious cardiovascular conditions in the future, and a risk of developing other diseases like immunodeficiency diseases, Parkinson's disease, Alzheimer's disease, dementia, diabetes, obesity, pulmonary diseases, and hearing loss (collectively, "genetic testing").  Although genetic testing is considered diagnostic testing subject to the regulations in 42 C.F.R. § 410.32(a), genetic testing is not a method of diagnosing whether a person has these diseases.

21.    In 2015, Novitas issued a Local Coverage Determination ("LCD"), which is a decision by Novitas as to whether to cover a particular item or service in its jurisdiction, titled L35062 (Biomarkers Overview) (effective Oct. 1, 2015).  LCD L35062 governs the circumstances in which the MAC considers genetic testing medically necessary (and thus properly reimbursable). The LCD requires, among other things, that the result of genetic testing directly impact the treatment being delivered to a beneficiary and considers as statutorily excluded from coverage genetic testing that would be considered screening.  Novitas's LCDs, including L35062, are publicly available and accessible through an LCD database search function on Novitas's website.

6

## VI.   Probable Cause to Believe that the Crime of Health Care Fraud Conspiracy has been Committed

### A. Relevant Entities and Individuals

22.    EK Advanced Laboratories LLC ("EK Advanced") was an independent clinical laboratory located at 6671 Southwest Freeway, Suite 312, Houston, Texas, and was formed in the State of Texas in and around December 2019.

23.    BioGen Labs, LLC ("BioGen") was an independent clinical laboratory located at 4007 Greenbriar Drive, Suite E, Stafford, Texas, and was formed in the State of Texas in and around October 2020.

24.    EQX Labs LLC ("EQX") was an independent clinical laboratory located at 19424 Park Row, Suite 120, Houston, Texas, and was formed in the State of Texas in and around August 2021.

25.    LabCare LLC ("LabCare") was an independent clinical laboratory located at 13601 Preston Road, Suite 306E, Dallas, Texas, and was formed in the State of Texas in and around October 2021.

26.    GeneTX Laboratory LLC ("GeneTX") was an independent clinical laboratory located at 11311 Richmond Avenue, Suite L107, Houston, Texas, and was formed in the State of Texas in and around March 2023.

27.    Appolo Precision LLC ("Appolo") was an independent clinical laboratory located at 11311 Richmond Avenue, Suite M111, Houston, Texas, and was formed in the State of Texas in and around April 2024.

28.    EK Advanced, BioGen, EQX, LabCare, GeneTX, and Appolo are collectively referred to as "the Texas Labs."

29.     Our IT Professionals LLC ("Our IT Professionals") was a limited liability company formed in the State of Georgia in and around August 2018.

30.     ABUNAKIRA was a resident of Harris County, Texas, and was the owner of Our IT Professionals.  ABUNAKIRA was involved in operating each of the Texas Labs.

### B.  ABUNAKIRA, Satary, and the Texas Labs

31.     ABUNAKIRA is the nephew of Khalid Satary and has worked for Satary since at least 2018 when he began working as an IT specialist for Satary's labs.  Satary was indicted on or about September 26, 2019, by a grand jury sitting in the Eastern District of Louisiana with multiple federal crimes including conspiracy to commit health care fraud and wire fraud, health care fraud, conspiracy to pay and receive kickbacks, and money laundering, all in connection with Satary's operations of labs that billed Medicare for genetic testing. *United States v. Satary,* Case No. 19-CR-00197 (E.D. La. 2019) ("Satary Indictment"). The Satary Indictment alleges that Satary orchestrated a sophisticated, multijurisdictional health care fraud scheme using labs in New Orleans, Georgia, and Oklahoma to fraudulently bill Medicare more than $500 million for medically unnecessary cancer genetic tests. The Satary Indictment further alleges that Medicare paid Satary approximately $134 million for these unnecessary cancer genetic tests, and that Satary then laundered the money he stole through a complex web of entities he controlled.  The Satary Indictment also alleged that Satary paid illegal kickbacks to marketers in exchange for the referral of these medically unnecessary genetic tests, which were often authorized by telemedicine physicians who were not the beneficiaries' treating physicians and who did not use the tests in the beneficiaries' treatment.  As a condition of Satary's release following his arrest, he was prohibited from working in health care and committing further crimes.  The court issued an arrest warrant for Satary for violating his pre-trial conditions in Case No. 19-CR-00197 on or about November 23, 2022, but Satary has not been located and remains a fugitive.

32.     ABUNAKIRA continued to work with Satary to operate the Texas Labs after Satary was indicted.  Satary, assisted by ABUNAKIRA, owned and operated at least the first four of the Texas Labs—EK Advanced, Biogen, EQX, and LabCare—employing a fraud scheme similar to the scheme alleged in the Satary Indictment.  ABUNAKIRA helped operate these labs knowing that Satary was illicitly involved, including after Satary's flight from prosecution. ABUNAKIRA also had a role in operating GeneTX and Appolo, the fifth and sixth of the Texas Labs, which also paid kickbacks to marketers for the referral of beneficiary DNA samples and signed doctors' orders for genetic testing that were medically unnecessary.

33.     The Texas Labs all have separate owners on their Medicare enrollment paperwork, none of which lists either Satary or ABUNAKIRA as having an ownership interest. The on-paper owners of EK Advanced, BioGen, EQX, and LabCare, however, each had ties with Satary. The on-paper owner of GeneTX was previously an employee at prior iterations of the Texas Labs.   The on-paper owner of Appolo was an IT technician with no prior lab experience.

34.     Satary was involved in operating and profiting from the Texas Labs through the operation of at least EK Advanced, BioGen, EQX, and LabCare.  Although Satary was not an authorized signer for any bank accounts used by the Texas Labs, Satary exerted control over the Texas Labs' financial operations, including with the help of Individual 1, who assisted Satary in moving lab funds and paying marketers from several of the labs.

35.     The Texas Labs also shared employees.  Texas Workforce Commission ("TWC") data revealed at least three employees with reported wages at four of the Texas Labs. In total, TWC data revealed nineteen employees whose wages were reported by at least two of the Texas Labs.

36.     Medicare claims data also reveals continuity of operations between the Texas Labs. Each of the labs billed Medicare extensively before either slowing its billing volume or receiving

a CMS payment suspension, at which point another lab's billing either started or increased.  For example, once the EK Advanced Medicare billing decreased, the Medicare volume and billing increased for BioGen.  Once the BioGen Medicare billing decreased, the Medicare volume and billing increased for EQX.  Once the EQX Medicare billing decreased, the Medicare volume and billing increased for LabCare.  CMS imposed a payment suspension for LabCare around August 10, 2023, and GeneTX thereafter began billing Medicare in and around September 2023. CMS imposed a payment suspension for GeneTX in and around the beginning of August 2024, and Appolo thereafter began billing Medicare in and around August 2024.

37.    The following table describes each of the Texas Labs' approximate billing date range and the approximate amounts each billed to and was paid by Medicare for genetic testing:

| Lab Name | Billing Date Range | Billed Amount | Paid Amount |
|---|---|---|---|
| EK Advanced | November 30, 2020–February 2022[1] | $25 million | $10 million |
| BioGen | April 20, 2021–January 2023[2] | $90 million | $34 million |
| EQX | April 19, 2022–May 17, 2023 | $23 million | $10 million |
| LabCare | October 14, 2022–August 14, 2023 | $29 million | $6 million |
| GeneTX | September 28, 2023–August 28, 2024 | $17 million | $11 million |
| Appolo | August 30, 2024–January 2, 2025 (continuing) | $19 million | $15 million |
| **TOTALS** | **November 30, 2020–Present** | **$203 million** | **$86 million** |

[1] EK Advanced billed 20 claims on June 10, 2024, which are also included in the totals, but likely amount to about $100,000.
[2] BioGen billed 20 claims on March 12, 2024, which are similarly included in the totals, but likely amount to about $100,000.

38.     Beneficiaries billed by the Texas Labs reported facts and circumstances consistent with fraudulent methods of acquiring beneficiary samples for genetic testing.  For example, some beneficiaries reported receiving a call soliciting them to agree to genetic testing and submitted DNA swab in the mail but explained that, to their knowledge, nothing ever came of it.  Other beneficiaries did not receive a phone call soliciting genetic testing nor did they report sending a DNA sample at all.  In most cases, the beneficiaries' treating physician was not involved in ordering the test, the beneficiaries did not recognize the name of the doctor who ordered the test, and many beneficiaries never received the results of the test nor recalled the results being used to treat any medical condition.

39.     ABUNAKIRA has been involved with all six of the Texas Labs, starting with EK Advanced, since as early as August 2020.  ABUNAKIRA was the point of contact for EK Advanced, EQX, and Lab Care with a lab software company, signing agreements on behalf of EK Advanced in and around January 2021, June 2021, and August 2021 with the title "IT manager." ABUNAKIRA signed agreements with the lab software company for EQX in and around November 2021 and May 2022, listing his title as "CEO" of EQX.  ABUNAKIRA signed agreements with the lab software company for LabCare (which initially went by the name Enova Diagnostics, LLC) in and around June 2022, listing his title as "COO."  As noted further below, ABUNAKIRA spoke on recorded calls about operating LabCare while Satary was a fugitive and about running GeneTX himself.  ABUNAKIRA was also a signatory on bank accounts for Appolo.

40.     ABUNAKIRA also benefitted financially from each of the Texas Labs.  From in and around August 2020 through in and around December 2024, ABUNAKIRA received approximately $1.28 million in payments to either himself or his company Our IT Professionals.

The table below summarizes the Texas Labs' payments to ABUNAKIRA (whether to himself directly or to Our IT Professionals), including amounts and date ranges associated with each lab:

| Lab Name | Approximate Date Range of Payments to ABUNAKIRA | Approximate Payment Amounts |
|---|---|---|
| EK Advanced | August 5, 2020–September 13, 2021 | $82,966.00 |
| BioGen | January 29, 2021–April 26, 2021 | $203,792.00 |
| EQX | April 8, 2022–July 1, 2022 | $68,110.00 |
| LabCare | November 7, 2022–May 12, 2023, 2023 | $214,500.00 |
| GeneTX | October 13, 2023–June 25, 2024 | $655,800.00 |
| Appolo | May 14, 2024–December 16, 2024 | $57,500.00 |
| **TOTAL** | **August 5, 2020–December 16, 2024** | **$1,282,668** |

In addition to these payments, ABUNAKIRA was one of the signers on the bank accounts for Appolo despite not being listed as an on-paper owner of Appolo with Medicare. ABUNAKIRA also received approximately $14,105 from Company 1, which was a company owned by Individual 1 and that was used to move funds from the Texas Labs, likely for the purpose of concealing the ownership or control of these funds by Satary.

### C. The Texas Labs' Illicit Marketing Arrangements

41.     The Texas Labs obtained many of the DNA samples and signed doctors' orders billed to Medicare by paying illegal kickbacks to marketers. As noted above, law enforcement used a CHS through much of the investigation to obtain information about the labs' operations and to make recorded calls. The CHS's job while he worked for the Texas Labs was to handle the Texas Labs' arrangements with marketers, a responsibility at times shared by ABUNAKIRA. The Texas Labs received DNA samples and signed doctors' orders to bill to Medicare by contracting with marketers who were compensated a flat fee for each DNA sample and signed doctors' order they submitted for which the Texas Labs received reimbursement. Many of these marketers used

call centers and telemedicine (including Telemedicine Company 1) to acquire the DNA samples and signed doctors' orders for genetic testing.  As stated in Medicare regulations, and as CMS made clear to GeneTX in a provider education letter described below, tests ordered by a provider with no prior relationship to a beneficiary and who did not use the test to manage a beneficiary's condition were not considered reasonable and necessary by Medicare.

42.    After the marketers sent samples to the lab, the Texas Labs would then send samples to a different lab to perform the testing.  After the test was run, the Texas Labs would bill Medicare and receive reimbursements into the Texas Labs' bank accounts.  The marketers would then be paid based on the number of samples they submitted, not based on the number of hours they worked as their contracts represented.

43.    The CHS was aware that it was illegal to pay marketers for each sample referred. Because of that, the CHS and the marketers had an unwritten, in the CHS's words, a "gentleman's agreement" about how much the marketer would receive for each DNA sample and signed doctors' order they submitted to the Texas Labs.  To conceal this illegal arrangement, the CHS and the marketers used a written contract providing for marketers to be compensated based on the number of hours worked. The marketers would send invoices making it appear as though they performed work on an hourly basis when, in fact, the amounts payable on the invoices were based on the volume of samples the marketers submitted.  Satary and his coconspirators used similar methods of concealing illegal kickbacks during the time frame of the Satary Indictment.

44.    Part of Satary's role at the Texas Labs was to determine the fee per sample to pay marketers and to track the commission that each marketer was owed based on the number of samples they submitted that resulted in reimbursements to the Texas Labs.  Satary maintained commission reports showing how many reimbursable samples marketers submitted and the agreed

fee per sample with each marketer, and Satary reviewed these reports with the CHS, who used this information to negotiate payment terms and reconcile amounts owed with marketers.

45.    The CHS, Satary, ABUNAKIRA, and others involved with the scheme, including marketers, used the messaging application Signal, which provides end-to-end encryption. The CHS communicated with Satary and ABUNAKIRA primarily over Signal.

### D. Recorded Calls with ABUNAKIRA After Satary's Flight

46.    The CHS began recording calls through Signal with ABUNAKIRA starting in and around December 2022, shortly after Satary fled, and stopped making recorded calls with ABUNAKIRA in and around September 2023.  The calls reveal that ABUNAKIRA acted as an intermediary between Satary and the CHS in the immediate aftermath of Satary's flight to allow Satary to continue to operate the labs while he evaded prosecution in the Satary Indictment. Though Satary began to communicate directly with the CHS in and around mid-January 2023, throughout the time of the recordings ABUNAKIRA also referenced ongoing communications he had with Satary, almost always using the alias "George," which the CHS explained was the alias he and his coconspirators agreed to use for Satary.  ABUNAKIRA also kept track of the Texas Labs' billings and reimbursements so the CHS could negotiate payments with marketers, and in some cases ABUNAKIRA discussed dealing directly with the marketers.  At the time the CHS began the recordings in and around December 2022, LabCare was the primary lab billing Medicare.

47.    The first recorded call occurred on or about December 22, 2022, when ABUNAKIRA called the CHS and informed the CHS that ABUNAKIRA had received calls from Marketer 1 asking about payment for samples that the marketer referred.  ABUNAKIRA updated the CHS on the status of billings submitted to the lab.  On the call the CHS said that he would need to meet with "George" to get all the balances (presumably, of amounts owed to marketers for

samples sent in) to reconcile the numbers.  ABUNAKIRA responded, "He will call you back but not now, later.  When everything is settle you know?"

48.     From in and around December 2022 through in and around early 2023, the CHS and ABUNAKIRA discussed, among other things, how much the Texas Labs received in reimbursements from samples the marketers sent in and how to negotiate payments with marketers. ABUNAKIRA relayed messages from Satary regarding what to pay marketers, and in at least one instance, sent the CHS commission reports regarding how much to pay each marketer.  These commission reports were in the same format Satary used when operating the Texas Labs while in the United States.  ABUNAKIRA's communications with the CHS revealed that ABUNAKIRA was familiar with the marketers who referred samples to the Texas Labs and knew that the marketers were paid a fee for each DNA sample and signed doctors' order the marketers submitted that resulted in reimbursement to the Texas Labs.  ABUNAKIRA also knew that the Texas Labs billed much of this genetic testing to Medicare.

49.     The CHS and ABUNAKIRA had a call on or about January 3, 2023, where ABUNAKIRA asked the CHS for the contact of a biller who put together CPT codes for genetic testing panels. ABUNAKIRA stated that he wanted to speak with the biller so they could fix their issue with receiving low reimbursements for cancer genetic tests.  ABUNAKIRA and the CHS had a call later that day where ABUNAKIRA discussed the low reimbursements for cancer genetic testing and ABUNAKIRA proposed setting aside cancer genetic testing samples (even though they had already been purportedly ordered by a physician) to focus on billing genetic testing for immunodeficiency diseases.  ABUNAKIRA remarked that "they" (presumably marketers) had "stopped sending anything.  They said that when we start paying they will send what they have." When the CHS asked why they did not have funds to pay the marketers, ABUNAKIRA responded

that Medicare often did not pay expected reimbursements all at once but instead paid in intervals, showing that ABUNAKIRA was aware the labs generated revenue from billing Medicare. ABUNAKIRA told the CHS that Marketer 1 had sent 94 samples for genetic testing for immunodeficiency diseases, directing the CHS to "take care of that [the 94 samples] for-for now with him." Based on my training and experience in this and other health care fraud investigations, I believe that ABUNAKIRA was directing the CHS to pay Marketer 1 when ABUNAKIRA said to "take care" of the samples with Marketer 1.

50.     ABUNAKIRA and the CHS spoke again about Marketer 1 the following day, on or about January 4, 2023. On that call ABUNAKIRA relayed that he had spoken with Marketer 1 again who "ma[d]e me crazy," because Marketer 1 wanted to know how much he would be getting. ABUNAKIRA told the CHS to tell Individual 1 to send Marketer 1 wires as soon as possible and to contact Marketer 1, stating that "George" wanted the CHS to call Marketer 1. Based on my training and experience in this and other health care fraud investigations, I believe that ABUNAKIRA was directing the CHS to pay Marketer 1.

51.     On or about January 4, 2023, ABUNAKIRA and the CHS spoke again about the fee per sample that the marketers were getting paid and discussed whether to send commission reports to the marketers. On or about January 6, 2023, the CHS and ABUNAKIRA discussed how to handle payment disputes with marketers. When the CHS said that another marketer, Marketer 2 was panicked and that ABUNAKIRA would have to tell "George" to talk to the marketer, ABUNAKIRA responded, "No problem, just text me, I will . . . call George. Okay? Text me what you want me to tell him." Later that day ABUNAKIRA and the CHS had another conversation about Marketer 2, with ABUNAKIRA saying "that guy is crazy . . . he wants to go to the, you know, to the FBI," if Marketer 2 was not paid on a sample. ABUNAKIRA then said, "let me just

call [Individual 1] and just tell him if there is a way he can pay them." Later that day ABUNAKIRA complained to the CHS that Marketer 2 was demanding payment of $9,000 for six samples (which amounts to $1,500 per sample). ABUNAKIRA told the CHS that ABUNAKIRA had told Marketer 2 that they were going to pay him for one sample and pay him for the remainder the following week.

52.    On or about January 9, 2023, ABUNAKIRA and the CHS spoke again. In that call, ABUNAKIRA told the CHS "at least now, you know, George is not here, we are better than before . . . . Before he's here, any call, any meeting is dangerous. Now it's better easy. I feel that way it would be better." This statement prompted the CHS to ask if "George" left. ABUNAKIRA responded, "George, I think so." When the CHS asked why "George" would leave when his wife and children were still in the United States, ABUNAKIRA told the CHS that they had gone to Dubai. ABUNAKIRA's statement that "any meeting is dangerous" when Satary was present and that demonstrates ABUNAKIRA's knowledge that Satary was not supposed to be involved in operating the Texas Labs. ABUNAKIRA's other statements on this date also demonstrate his knowledge that Satary had become a fugitive.

53.    On or about January 10, 2023, ABUNAKIRA and the CHS continued to discuss their payment dispute with Marketer 1, with ABUNAKIRA stating "I sent you the [Marketer 1] uh how much we get paid last two check from uh Medicare." ABUNAKIRA appears to be referring here to an accounting of how much the Texas Labs received from Medicare for samples Marketer 1 referred. In this discussion, the CHS said, in reference to paying Marketer 1, "I probably need to go meet [Individual 1] in person, but we've got to have a real conversation." ABUNAKIRA responded, "Just go and tell him that 'I want to meet you' and meet him because on the phone, he don't like to speak." When the CHS responded, "I mean its Signal though, it's

safe," ABUNAKIRA responded, "I know, but anytime I tell him, he don't, uh he (Individual 1) don't understand."  ABUNAKIRA encouraged the CHS to go talk with Individual 1, saying, "If you go to him and you sit with him, it's better.  You know the situation now, he's scared, he don't want to deal with everybody."

54.     The following day, on or about January 11, 2023, after the CHS and ABUNAKIRA discussed that Satary was on the FBI's Most Wanted list, ABUNAKIRA responded "let's sit, relax, and wait until everything calm down; and see what's . . . going to happen.  I hope the business keeps going because we need income, you know . . . . Because we have big things going, you know."  ABUNAKIRA told the CHS to "be careful, don't mention anything about me.  Because you know, I'm related to him. . . [L]et's be . . . hiding until everything becomes, you know, okay."  Here ABUNAKIRA appears to be referencing that he is Satary's nephew and proposing to the CHS that they keep a low profile to avoid anybody connecting ABUNAKIRA and Satary to the labs.

55.     On January 23, 2023, CMS conducted a site visit of LabCare to determine whether LabCare was open and operational and to obtain medical records for post-payment medical review. An individual at the lab indicated that the lab was not set up to conduct lab testing and should be ready in a few weeks.  An individual at the lab explained that the lab needed to contact the biller to obtain records, who was identified as "Rami" (ABUNAKIRA's first name), stating that "Rami" knew more than the individual did about the business processes.

56.     On or about January 30, 2023, ABUNAKIRA and the CHS spoke again regarding their payment disputes with the marketers.  The CHS explained that he had to deal with Marketer 1, stating that he needed to "talk with G about . . . the payment report and do full reconcile with [Marketer 1's] account."  ABUNAKIRA responded, "Okay no problem.  I will work on that."

Later in the call ABUNAKIRA told the CHS to use a VPN on his phones and computers, so "anything you do it, in your anything you do—you does in your phone or in your computer nobody will have—it will be more secure okay?"  When the CHS asked if it was "safe" and "makes the phone okay," ABUNAKIRA responded, "Yes. . . . they don't have more information about what you are using, which apps, how many device in your home, all that information it will not show." When the CHS responded to this statement by remarking that they were in a stressful situation, ABUNAKIRA replied, "What to do.  This is the business."  When the CHS, whom ABUNAKIRA knew previously had contact with law enforcement regarding the Texas Labs, remarked that he had not heard anything back about his contact with law enforcement, ABUNAKIRA responded, "They don't—they don't have anything man. . . Don't worry."  Later ABUNAKIRA said, "it will go away because you know I don't think they have something against us.  The only thing that they want George and they couldn't find him or they couldn't get him so that's it."

57.     The CHS and ABUNAKIRA spoke again on or about January 31, 2023, about the ongoing payment dispute with Marketer 1.  ABUNAKIRA said, "He don't want to listen.  So I show George the Excel of all the CP [samples referred], the immune system we receive from [Marketer 1], okay? . . . Some of them we get paid.  Some of them we didn't get paid.  So I was thinking that if we show him, if we give [Marketer 1] the Excel, he will get to know.   But he ['George'] said no don't give him the Excel sheet."  ABUNAKIRA said he would send the Excel sheet to the CHS and that he preferred to do it via Signal, saying, "I don't prefer by email because it's all real accounts, payments and like that."

58.     On or about February 16, 2023, the CHS and ABUNAKIRA continued to discuss their ongoing disputes with marketers and discussed that "George" told the CHS to send Marketer 1 some money.  Given the difficulties with Marketer 1, ABUNAKIRA encouraged the CHS to

focus on maintaining a business relationship with Marketer 3, who was sending samples to the labs. Later in the conversation the CHS expressed concern that "at some point they are gonna wanna. . . do something, I will think," apparently referring to CMS or law enforcement. ABUNAKIRA responded, "Nobody knows, but just I-mean-we are not doing anything wrong. The only issue was. . . . that guy. He's not there, sooo-we're okay." Based on the context of this and other conversations, ABUNAKIRA appeared to mean Satary when he referenced "that guy."

59.     The following day, on or about February 17, 2023, ABUNAIRKA returned to the topic of resolving payment disputes with Marketer 1, who wanted the lab to rebill samples that had been rejected, presumably so he could get paid on those samples. ABUNAKIRA said, "I mean he wants us to rebill them. . . . I cannot red flag this company . . . Medicare just to cause his samples, fuck his samples you know." ABUNAKIRA instructed the CHS to tell Marketer 1 that the lab did not get anything from the samples other than $1,200 for each sample he submitted.

60.     On or about April 18, 2023, the CHS and ABUNAKIRA spoke about a new marketer, Marketer 4, with ABUNAKIRA complaining about the marketer, saying "he's strange you know? He send the email to us, he mentioned me and you in the email, and he's communicating with his reps or his accounts. . . . Like, we are paying this much and you need to take care of this. Ok?" ABUNAKIRA asked the CHS to speak with Marketer 4, instructing the CHS to "[t]ell him just be between you and him. He don't need to send us any email about the marketing, or how much he's paying per hour, or you know his things." Later in the call the CHS referenced a discussion with "George," saying that "George" relayed that he spoke to Marketer 3 and discussed paying Marketer 3 and getting more samples. When the CHS said he did not think Satary had anybody's phone number, ABUNAKIRA responded, "No he had everybody phone number. Any account we create, we give him the information." When the CHS questioned why

he would reach out to marketers "with his current situation," ABUNAKIRA responded, "He's reaching out because he don't want to lose uh, [Marketer 3] maybe."  In discussing email communications with Marketer 4, ABUNAKIRA also noted that Marketer 4's sub-marketers were using Telemedicine Company 1, demonstrating that ABUNAKIRA knew the marketers were using telemedicine doctors to obtain signatures for the requisition orders.

61.    On or about May 4, 2023, ABUNAKIRA informed the CHS that Satary had gotten a phone call from somebody with a Houston number who then called ABUNAKIRA, asking not for "George," but for Khalid (Satary's first name).  ABUNAKIRA then told the CHS "so what I'm going to do because I spoke with him this number I'm going to delete this phone number and the Signal ok, delete few numbers and later when I have another I will give you I will share it with you ok."  ABUNAKIRA expressed confusion as to how the caller could have gotten Satary's number, and when the CHS said he had not shared the number, ABUNAKIRA continued to speculate as to how somebody could have obtained Satary's number, saying "even the name we didn't share his name we say George why he said Khalid? . . . ok so I'm telling that I'm going to delete my Signal delete your phone George everybody phone number until everything setup, until we see what's going to happen ok. . . . so I will delete the phone, wipe the phone because I don't know what's going to happen ok."

62.    On or about May 16, 2023, ABUNAKIRA told the CHS that they were having an inspection at the lab (Medicare records suggest that ABUNAKIRA was referring to GeneTX, as records show that CMS attempted a site visit on or about May 9, 2023, and did a site visit on or about May 24, 2023).    ABUNAKIRA expressed concern that if the lab did not appear to be functioning, it would close.  ABUNAKIRA said that people at the lab "want any account to send them Covid or UTI," asking "[i]f there is a way we can just take care of it at least this month before

the inspection because if we didn't run anything inside the lab, and ugh, inspector came to the lab and didn't see any live samples, even if it's a few, it's better than nothing."  Later in the call ABUNAKIRA asked the CHS if "we need you communicating with them or being away from these people?", apparently referring to marketers. ABUNKIRA later added, "I cannot communicate.  You know the situation.  It will link me to George.  If you communicate you are working with a different lab in Dallas, nobody will link this lab to George."

63.    On or about July 11, 2023, ABUNAKIRA spoke with the CHS about ABUNAKIRA having talked "with Mr. George" yesterday.  ABUNAKIRA explained, "he told me he is going to accept money and he said that to give you, there is a new lab called GeneTX. He wants me to give you the papers and he wants you to just send it to [Telemedicine Company 1]."  ABUNAKIRA said that he would create a new email, username, and password for the CHS and a link to marketing materials and requisition forms, saying that he would "send everything to you by Signal then you move it to somewhere ok?"  Based on my training and experience in this and other health care fraud investigations, I believe that ABUNAKIRA wanted to use Signal to send the CHS marketing materials for the lab to avoid creating an email record that linked ABUNAKIRA to GeneTX.

64.    On or about July 19, 2023, ABUNAKIRA complained about having difficulties setting up the new lab (apparently referring to GeneTX) and contacting Satary, saying "I think because there is no money, he will not call or speak with anybody because he knows we are going to ask for money."  ABUNAKIRA and the CHS discussed whether the on-paper owner of LabCare had possibly drained the bank accounts, and later in the conversation ABUNAKIRA said, "but now it will be changed you know I told you.  Now I will be taking care of things like the bank and these things so I can update you beginning so we know what's happening."

65.     On or about July 21, 2023, the CHS, apparently referring to Satary, asked ABUNAKIRA, "Any update from our guy?"  ABUNAKIRA relayed that "he" (also apparently referring to Satary) sent six thousand dollars to pay rent and made the on-paper owner of LabCare send ABUNAKIRA six thousand dollars as well.  ABUNAKIRA opined that about $235,000 was coming to LabCare, "so within these two week we are receiving a good money."  In response to the CHS's question about whether LabCare's owner would take the incoming funds, ABUNAKIRA said, "we need to learn our lesson we need to do like a different way with business keeping everything under one guy and he decides to screw us, we are going all fucked this is the problem. . . . like I told you, let's focus on the business and then for the new location and then, if anything comes here we can control things you know.  There is a little bit difficult."

66.     On or about July 28, 2023, ABUNAKIRA followed up on his prior complaint about Satary's practice of using on-paper owners whom they had to trust not to steal funds deposited in the lab accounts.  ABUNAKIRA told the CHS, "Listen, how about we run this show together . . . You know so at least, if we know we can like you run you . . . you focus at the business bringing the business like say reps and accounts and I focus inside taking care of the labs, and the supplies and all that shit and the system.  And then let's focus forget about George for now, like let's focus make things good.  And then later if he will he comes, okay uh-uh welcome, if he don't want to come and he wants to be away, it's fine. . . . [W]e don't have money we need samples so we can get some money so that we can run this thing.  You get my point?"  In this exchange, ABUNAKIRA appeared to be suggesting that he and the CHS run GeneTX together without waiting for Satary to get involved, with the CHS continuing his role of negotiating and dealing with marketers who referred samples to the lab. When the CHS said he was pushing contracts out to new marketers, ABUNAKIRA reiterated, "forget about George. Let's focus as this is our

business we are running this thing until he answer or until he have cash or until he have money . . . if we wait for him everything will be destroyed everything will be gone, I'm not going to wait. . . . [L]et's run the business together, okay. But don't tell anybody that, the between me and you. Okay, let's run the thing, okay? And if he come and he have the cash and everything is good, okay welcome you run things."

67.     On or about August 10, 2023, Medicare issued a payment suspension to LabCare.

68.     Throughout August 2023 the CHS and ABUNAKIRA continued to have discussions about how to transition to another lab, GeneTX, given that they did not have access to money coming to LabCare and had not heard from Satary about funding for the new lab. On or about August 22, 2023, ABUNAKIRA advised the CHS to consider looking for other options to "find something on the side until he [Satary] gets more money" and to "forget about that labs until George comes back with money." On or about August 25, 2023, ABUNAKIRA again noted that Satary was not being responsive and proposed that he and the CHS find a way to run the business without "George." ABUNAKIRA told the CHS, "The business is there, the license is there, everything is there, it's ready to go. So the only issue with this lab, there is no equipment, ok. There is no equipment, there is no lab, but that we can fix it later, we can send the samples to a referenced lab if we can get samples, get the money, ok. Then we can buy, equipment it should, it shouldn't be expensive, any, any-like small test." ABUNAKIRA explained that he would have an associate send the CHS requisition forms, marketing material, and practice profile forms that are used to collect information about referring providers to the lab to enter into the lab's software systems.

69.     On a phone call a few days later, on or about August 30, 2023, ABUNAKIRA explained that he had "bad news," and they would not be getting any money from the on-paper

owner of LabCare.  On or about August 31, 2023, the following day, ABUNAKIRA again asked the CHS to reach out to the marketers he knew and to entice them to start sending samples by saying the new lab had nothing to do with old business. When the CHS talked about giving Satary more time to decide to invest in the new lab, ABUNAKIRA said "[CHS], we can run this shit ourselves."

70.    ABUNAKIRA followed up with the CHS on September 5, 2023.  The CHS explained that he had spoken with "George" and called several marketers he knew, and that "George" was negotiating with them to send new business.  When ABUNAKIRA asked the CHS if he had communicated with Marketer 5, the CHS told ABUNAKIRA that he should contact Marketer 5 directly because the CHS did not end on good terms with Marketer 5.  ABUNAKIRA stated that he would speak with Marketer 5 directly, but that he wanted the CHS to sign the contract paperwork.  ABUNAKIRA and the CHS spoke the following day, on or about September 6, 2023, about more marketers that they were trying to get to send samples to GeneTX.  On or about September 7, 2023, the CHS informed ABUNAKIRA that all the contracts were out for signature.

71.    On or about September 11, 2023, ABUNAKIRA followed up with the contracts, and asked the CHS to send him all the signed contracts when they were returned.  ABUNAKIRA emphasized that he wanted to get to work on the new lab and did not want to wait for Satary, and again emphasized taking control of the GeneTX operations themselves.  ABUNAKIRA asked the CHS to take care of the marketers and make sure they were comfortable, and to serve as the point of contact if they had any questions about doing business with the new lab, as opposed to bringing in Satary or ABUNAKIRA.

72.    On or about September 12, 2023, the CHS had a recorded call with ABUNAKIRA where ABUNAKIRA spoke about conversations he had with the on-paper owner of LabCare and

financial issues the on-paper owner had regarding his expenses related to LabCare.  ABUNAKIRA expressed his belief that LabCare's money was gone and asked the CHS for updates about "[t]he new place."  The CHS explained that he had arranged with marketers, including Marketer 6, to send to the new lab.  ABUNAKIRA asked the CHS to keep in touch with "all this people with you" and offered to put the CHS on the payroll of the new lab so that the CHS could get paid.

73.     On or about September 15, 2023, ABUNAKIRA called the CHS to discuss taking samples procured through "doc chase," referring to a practice in which marketers use call centers to obtain signed doctors' orders for genetic testing from a beneficiary's treating physician, often by barraging them with requests for signatures using deceitful tactics, instead of from a telemedicine doctor who had no prior relationship to a beneficiary.  ABUNAKIRA referenced receiving samples from Marketing Company 1 and Marketing Company 2.  ABUNAKIRA noted that two samples received from Marketing Company 2 had already been billed by LabCare and that he planned to reject the samples and contact the marketers to ask them not to send repeated samples.  ABUNAKIRA told the CHS that once they had "reports," apparently referring to genetic testing results, "we will do the billing."

74.     The CHS's recorded calls with ABUNAKIRA ended after the call on or about September 15, 2023.  ABUNAKIRA deactivated the phone number the CHS used to make recorded calls in November 2023.

### E.  ABUNAKIRA's Operation of GeneTX and Appolo Precision

*i.  GeneTX*

75.     Although ABUNAKIRA ceased communications with the CHS in September 2023, ABUNAKIRA continued to operate GeneTX, which continued to bill Medicare and continued to pay marketers who referred genetic testing to the labs.

76.    In the recorded calls with the CHS, ABUNAKIRA first referenced GeneTX to the CHS on or about July 11, 2023.  Medicare claims enrollment records for GeneTX show that on or about May 2, 2023, Employee 1, signed the CMS 855B Certification Statement as its Authorized Official and sole person with an ownership interest.  That same day surveillance showed ABUNAKIRA arriving and exiting GeneTX.  According to TWC data, Employee 1 has been an employee of the Texas Labs since at least the fourth quarter of 2021 and has received wages from BioGen, EQX, LabCare, and GeneTX.

77.    Medicare's Provider Enrollment, Chain, and Ownership System ("PECOS") showed that GeneTX had submitted an organizational flow chart for GeneTX listing Employee 1 as the CEO and Owner along with three other individuals including a Lab Director, Lab Supervisor, and Accessioning Supervisor.  ABUNAKIRA was not listed in the organization chart, notwithstanding his statements to the CHS in recorded calls that he planned to run GeneTX himself.

78.    Communications obtained from devices the CHS used as part of his business for the Texas Labs show that ABUNAKIRA and Employee 1 had a working relationship since at least BioGen.  On or about February 2, 2022, Employee 1 sent an email from her BioGen email address to ABUNAKIRA's BioGen email address, where Employee 1 referenced a call she received from a woman who had power of attorney of her elderly mother and wanted her mother removed from a kit sending list, and stated that she would complain about the lab if they sent her anything again.  This shows that Employee 1 was seeking guidance from ABUNAKIRA on BioGen operations.

79.    In and around February 2022, the biller for EK Advanced, BioGen, and EQX texted Employee 1 about the CMS paperwork for setting EQX up with a billing system.  On or about

March 1, 2022, in response to a question from the biller, Employee 1 responded, "I'll have to check with ABUNAKIRA," again showing that Employee 1 took guidance from ABUNAKIRA.

80.    ABUNAKIRA has also paid Employee 1 approximately $11,918 out of Our IT Professionals from in and around November 2022 through in and around August 2023.

81.    GeneTX began submitting claims to Medicare on or about September 28, 2023, exclusively for genetic testing, similar to the prior Texas Labs that billed mostly claims for genetic testing with some claims for COVID-19 testing.

82.    In an electronic funds transfer form submitted to Medicare, GeneTX designated Bank of America account ending 4595 ("BoA 4595") as the account to receive reimbursements for claims GeneTX submitted to Medicare.  Employee 1 was the sole signer on Bank of America account ending 4595.

83.    According to bank records from GeneTX BoA 4595, from in or around October 2023 through in or around June 2024, Employee 1, who claimed to be GeneTX's CEO and Owner, received approximately $100,000 from GeneTX, in contrast to the approximately $655,800 ABUNAKIRA received from GeneTX during that same time frame either directly to himself or to his company Our IT Professionals.  Approximately $310,000 of GeneTX funds were also used to pay for a house for ABUNAKIRA in Fort Bend County, Texas.

84.    Bank records also show that GeneTX paid marketers who had previously referred to one of the other Texas Labs.  ABUNAKIRA discussed each of these marketers with the CHS at some point during the time ABUNAKIRA communicated with the CHS after Satary's flight.  The table below includes a non-exhaustive summary of the marketers who received payments from GeneTX and includes the approximate amounts paid from GeneTX, the approximate date range of

these payments, which other of the Texas Labs the marketers referred to, and the approximate

dates ABUNAKIRA and the CHS discussed these marketers on recorded calls:

| Marketer | Previous Texas Lab(s) Referred | Approximate Amount Paid | Approximate Date Range of Payments | Approximate date(s) ABUNAKIRA referenced marketers on recorded calls |
|---|---|---|---|---|
| Marketing Company 1[3] | LabCare | $1,493,980.64 | October 2023 to August 2024 | September 15, 2023 |
| Marketing Company 3 | BioGen EQX LabCare | $437,012.09 | January 2024 to August 2024 | January 30, 2023; February 16, 2023; April 18, 2023; July 10, 2023; and August 1, 2023 |
| Marketing Company 4 | LabCare | $904,753.82 | January 2024 to October 2024 | September 12, 2023 |
| Marketing Company 5 | EK Advanced BioGen EQX LabCare | $773,079.78 | October 13, 2023, to August 2024 | January 30, 2023; August 21, 2023; September 6, 2023 |
| Marketing Company 6 | LabCare | $125,094.11 | December 2023 to October 2024 | March 4, 2023; September 5, 2023 |
| Marketing Company 7 | LabCare | $98,702.00 | November 2023 to April 2024 | September 5, 2023 |

85.    At some point before these marketers did business with GeneTX, individuals

associated with all except Marketing Company 7 emailed with the CHS regarding marketing

arrangements with the Texas Labs prior to GeneTX. In some of these conversations, the CHS

discussed compensation arrangements with the marketers, including how to conceal flat fee

payments to the marketers through a sham calculation based on hourly work.  The CHS also

---

[3] On ABUNAKIRA's recording with the CHS on or about September 15, 2023, ABUNAKIRA referenced receiving samples from Marketing Company 2, which is not listed in this table.  In an email dated March 2, 2023, the individual associated with Marketing Company 2 wrote to the CHS that Marketing Company 2's "LLC under process and it will take sometime to have a bank account meanwhile you can use [Marketing Company 1's] account for me."

executed contracts with these marketers that provided for invoicing based on the number of hours purportedly worked and received hourly invoices from these marketers.  Both the agreements and invoices were shams, as the CHS and Satary actually determined the marketers' compensation based on the volume of samples they submitted and that were reimbursed by Medicare.

86.    On June 5, 2024, CMS sent GeneTX a letter informing GeneTX that it was inappropriately billing for services rendered to Medicare beneficiaries and including a Provider Education document explaining the results of a medical review.  The Provider Education document noted that out of eleven claims for genetic testing for immunodeficiency CMS reviewed, all were denied as failing to have sufficient documentation to meet the criteria that the immunodeficiency genetic disease risk panel be reasonable and necessary.  The Provider Education document gave two examples of specific claims reviewed, noting that the beneficiaries had telehealth consults of between five to seven minutes, which failed "to provide sufficient information regarding the need for the testing."  The letter also noted that "[d]ocumentation did not include a physical exam, social history, allergies, or a review of systems; however, noted an extensive personal and family history was obtained," and that the documentation did not include "[t]he rationale of how the testing would assist the ordering provider in managing the beneficiary's condition."  The Provider Education document also noted that for the two examples there was no documentation "to indicate a prior relationship between the beneficiary and the provider, or that the ordering provider was the physician managing the condition that the test."  In the June 5, 2024 letter informing GeneTX of the results of this review, CMS informed GeneTX that it had received an overpayment of approximately $32,642.98.  CMS issued a demand letter on June 24, 2024, requesting that GeneTX repay the amount of the overpayment.  No evidence exists from Medicare records or GeneTX bank records that GeneTX repaid this amount.

ii.    *Appolo*

87.    Medicare issued a payment suspension for GeneTX around August 2024.  That same month, Appolo began billing Medicare exclusively for genetic testing.

88.    Surveillance at Appolo's business location in September 2024 showed that Appolo shared a parking lot with GeneTX.  Surveillance also identified an individual walking into GeneTX's suite, later exiting GeneTX's suite and walking towards Appolo's suite, and then later walking back from Appolo's suite and re-entering GeneTX.

89.    Medicare claims enrollment records for Appolo show that on or about May 29, 2024, Individual 2 signed the CMS 855B Certification Statement as its Authorized Official and sole person with an ownership interest.  This same form lists Employee 1 as the contact person for Appolo.  Texas Workforce Commission data and Individual 2's LinkedIn page show that Individual 2 worked as a technician at Houston Community College and later at a company that provided software for higher education.  Neither the Texas Workforce Commission data nor Individual 2's LinkedIn page show that Individual 2 was involved in the lab industry prior to submitting the CMS 855B that listed Individual 2 as the sole person with a five percent or more ownership interest in Appolo.

90.    Medicare's PECOS showed that Appolo had submitted an organizational flow chart for Appolo listing only Individual 2 as the Owner and Authorized Official along with three other individuals including a Lab Director, Lab Supervisor, and Accessioning Supervisor. ABUNAKIRA was not listed in the organization chart.

91.    Although the CMS 855B and the organization chart Appolo submitted to Medicare listed Individual 2 as the sole owner of Appolo, ABUNAKIRA was a signer on all three bank accounts associated with Appolo along with Individual 2.  According to Appolo bank records, from in and around August 2024 through in and around October 2024, Individual 2 received

31

approximately $25,415 from Appolo Bank of America account ending in 8372 ("BoA 8372").  In and around November 2024, Individual 2 received approximately $10,000 from Appolo JPMC account ending in 9556.  And from in and around January 2025 through in and around January 2025, Individual 2 received approximately $12,500 from Apollo Bank of Texas account ending in 9542 ("BoA 9542").  In total, from in and around October 2024 through in and around January 2025, Individual 2 received approximately $47,915 from the Appolo bank accounts.

92.    ABUNAKIRA received approximately $57,500.00 from Appolo's bank accounts. These included transfers of approximately $32,500 to either ABUNKIRA or his company Our IT Professionals from BoA 8732 from in and around August 2024 through in and around October 2024.  Our IT Professionals also received approximately $20,000 in and around December 2024 from BoA 9542.

93.    Appolo's bank accounts also reflect payments to and deposits from Company 3, which was owned by Individual 1.  As noted above, Satary used Individual 1 to move funds while Satary was illicitly involved with the Texas Labs, including to make payments to marketers, which the CHS and ABUNAKIRA also discussed in recorded calls.  From in and around July 2024 through in and around September 2024, Company 3 received $700,000 in funds from BoA 8372, though in and around August 2024 Company 3 deposited $200,000 into BoA 8372.  Company 3 also deposited $100,000 into the Appolo JPMC account ending in 7362 in and around December 2024.  Individual 1 also owned Company 4, which received approximately $17,727.00 from BoA 8372 from in and around September 2024 through in and around October 2024, and approximately $29,366.00 from BoA 9542 from in and around December 2024 through in and around January 2025.

94.     Like GeneTX, bank records show that Appolo also paid marketers who had previously referred to one of the other Texas Labs (including GeneTX).  ABUNAKIRA discussed each of these marketers with the CHS at some point during the time ABUNAKIRA communicated with the CHS after Satary's flight.  The table below includes a non-exhaustive summary of the marketers who received payments from Appolo and includes the approximate amounts paid from Appolo, the approximate date range of these payments, which other of the Texas Labs the marketers referred to, and the approximate dates ABUNAKIRA discussed these marketers with the CHS on recorded calls:

| Marketer | Previous Texas Lab(s) Referred | Approximate Amount Paid | Approximate Date Range of Payments | Approximate date(s) ABUNAKIRA referenced marketers on recorded calls |
|---|---|---|---|---|
| Marketing Company 1 | LabCare GeneTX | $2,331,646.13 | September 2024 to January 2025 | September 15, 2023 |
| Marketing Company 3 | BioGen EQX LabCare GeneTX | $133,764.00 | September 2024 to January 2025 | January 30, 2023; February 16, 2023; April 18, 2023; July 10, 2023; and August 1, 2023 |
| Marketing Company 4 | LabCare GeneTX | $913,748.03 | September 2024 to January 2025 | September 12, 2023 |
| Marketing Company 5 | EK Advanced BioGen EQX LabCare GeneTX | $290,171.23 | September 2024 to January 2025 | January 30, 2023; August 21, 2023; September 6, 2023 |
| Marketing Company 6 | LabCare GeneTX | $294,684.11 | September 2024 to January 2025 | March 4, 2023; September 5, 2023 |

**VII.** <u>**Conclusion**</u>

95.     Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around December 2022, and continuing through the present, in the Southern District of Texas, and elsewhere, ABUNAKIRA committed violations of 18 U.S.C. § 1349.

96.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Gina Vogel*
Gina Vogel
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to by telephone, and I find probable cause this 28th day of February 2025.

Hon. Richard W. Bennett
United States Magistrate Judge